438 So.2d 31 (1983)
James Joseph ERP, Appellant,
v.
Lillian Knapp CARROLL, Appellee.
No. 81-1405.
District Court of Appeal of Florida, Fifth District.
August 18, 1983.
Rehearing Denied September 27, 1983.
*34 Seymour H. Rowland, Jr., Ocala, for appellant.
John H. Piccin of Musleh, Piccin, Atkins & Krehl, Ocala, for appellee.
COWART, Judge.
This case involves the proper function and scope of impeachment of an adverse party when called as a witness under Florida Rule of Civil Procedure 1.450(a) and whether, for one wrongful arrest, recovery can be had for separate damages under both the theory of false imprisonment and the theory of malicious prosecution.
Appellee, hereinafter called plaintiff, sued appellant, hereinafter called defendant, for compensatory and punitive damages for malicious prosecution, false imprisonment, slander, and intentional infliction of emotional distress. At trial, during the presentation of evidence in the plaintiff's case in chief, the plaintiff called two witnesses, who, over objection, testified that the defendant's reputation in the community for truth and veracity was bad.[1]
During the defendant's case in chief the defendant did not take the stand in his own behalf and called but one witness, Deputy Sheriff Caraway, who testified only about his own actions on May 10, 1978, in talking with a Mr. Ramputi and in arresting the plaintiff based on information he received from Mr. Ramputi and from the plaintiff and her husband. When Deputy Caraway was asked by defense counsel if he had a conversation with the defendant on May 10, 1978, Deputy Caraway answered, "No, sir, I have not met the gentleman." Plaintiff's counsel on cross-examination asked Deputy Caraway, "You have never seen Mr. Erp before and you really wouldn't know whether he was one of the people there [at the scene of the arrest] or not, would you?" Answer, "No, sir."
On rebuttal plaintiff called the defendant as a witness on behalf of the plaintiff and began examining him about his actions outside the presence of the arresting officer and involving nothing in anyway inconsistent with the testimony of the arresting officer. The defendant in fact corroborated Deputy Caraway's testimony saying, "I never really seen [sic] Officer Caraway, never talked to him" and "I told you and so did Mr. Caraway that I've never talked to Mr. Caraway ... it was a sheriff or police, but I never talked to Deputy Sheriff Caraway." When plaintiff's counsel asked the defendant about the defendant telling "the previous jury in this case you've been convicted of  " defendant's counsel objected on the ground that the plaintiff's testimony was in no way in rebuttal to that of Officer Caraway saying, "They're putting this in solely for the purpose of asking him how many times he's been convicted of a crime and that's inflammatory  [and] should not be injected in this trial." At the urging of plaintiff's counsel the trial judge declared the defendant was an adverse witness because he was an adverse party but that the defendant could not be impeached as to conviction of crime unless his testimony was *35 inconsistent with some prior testimony. Accordingly, plaintiff's counsel questioned defendant about his previous testimony in a deposition and finally the court permitted plaintiff's counsel to impeach the defendant by asking him if he had ever been convicted and how many times.[2]
It was error to permit plaintiff in her case in chief to introduce evidence of the defendant's bad reputation for truth and veracity because the defendant's veracity was not relevant to any issue in the cause being tried and the defendant had not testified and his credibility was not in issue. A witness may not be impeached before he has testified.[3]
Where the defendant was called solely as a rebuttal witness, it was also error to permit plaintiff to elicit testimony which in no substantial way contradicted or rebutted the testimony of the defendant's only witness, Deputy Caraway. This error in permitting the plaintiff to call the defendant as a so-called rebuttal witness and then to elicit non-rebuttal testimony did not serve to correct the first error in permitting a premature and unwarranted impeachment as to the defendant's reputation for veracity nor did it become a proper basis for then permitting impeachment as to conviction for crime.
Florida Rule of Civil Procedure 1.450(a), the "adverse witness" rule, provides:
A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also and may be cross-examined by the adverse party only upon the subject matter of his examination in chief.
This subsection of rule 1.450 was adopted from former Fed.R.Civ.P. 43(b) (1937). In connection with the enactment of the Federal Rules of Evidence in 1975, Federal Rule 43(b) was abrogated as it was considered no longer needed or appropriate because the scope of cross-examination was covered by Fed.R.Evid. 611(b); the interrogation of an adverse party or witness identified with him was covered by Fed.R.Evid. 611(c) and impeachment was treated in Fed. R.Evid. 607. The abrogation of Federal Rule 43(b) because of the enactment of the cited provisions of the Federal Rules of Evidence also implicitly serves to construe the purpose of the former federal rule and of our present rule 1.450(a) which is based on the former federal rule. Section 90.612(2), Florida Statutes (1981), now provides for the scope of cross-examination, substantially adopting the substance of Fed. R.Evid. 611(b). Section 90.612(3), Florida Statutes (1981), now provides generally for leading questions only on cross-examination and recross-examination and the topic of who may impeach is now provided in section 90.608, Florida Statutes (1981). Accordingly, consideration should be given to the elimination of the second sentence in Florida Rule of Civil Procedure 1.450(a) for the same reason that Federal Rule 43(b) *36 was abrogated. The first sentence of Florida Rule of Civil Procedure 1.450(a) would then specifically provide for the use of leading questions as to unwilling or hostile witnesses, as an exception provided by rule of court as is explicitly permitted by section 90.612(3), Florida Statutes (1981). Actually the first sentence in rule 1.450(a) would be slightly improved by being replaced with the last sentence in Fed.R.Evid. 611(c), which provides:
where a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.
Actually, peculiarly, the Florida Evidence Code has not heretofore been applicable to this particular action because when our code was first adopted it applied only to civil actions accruing after July 1, 1979, and the cause of action in this case accrued on May 10, 1978. Although section 90.103, Florida Statutes (1979), was amended in 1981 to make the Florida Evidence Code applicable to civil actions pending on or brought after October 1, 1981, this action had already been tried by that date. However, the 1981 amendment to the statute would make the Florida Evidence Code applicable to any retrial of this case. While the Florida Evidence Code was not applicable to the trial of this case below, we interpret the supreme court's approval of the Florida Evidence Code, 376 So.2d 1161 (Fla. 1979), without the amendment of Florida Rule of Civil Procedure 1.450(a) to mean that provisions of both the statute and the rule need not, and should not, be construed to be inconsistent.[4] The proper application of Rule 1.450(a) as to leading questions, contradictions and impeachment is simplified by looking to substance rather than to form and by bearing in mind the proper purposes and functions of these tools and rules of evidence.
LEADING QUESTIONS: Although a party rarely has a choice in selecting the witnesses needed to prove his case, nevertheless a party who calls a witness is expected to have reason to believe that the witness will give testimony favorable to that party without the need to use leading questions. From this assumption comes the general rule that a party may not ask a witness a leading question on direct or redirect examination. Fla. Stat. § 90.612(3)(a), (1981). On the other hand there is a similar assumption that a witness did give favorable testimony to the calling party and that the adverse party generally needs, and should be given, the advantage of using leading questions on cross-examination of that witness in the interest of a proper search for the truth. Fla. Stat. § 90.612(3)(b), (1981). There is also a general principle that a party who calls a witness as his own vouches for that witness' credibility. It is for this reason that there is a traditional rule against impeaching a party's own witness. Fla. Stat. § 90.608(1), (1981). There was a broad primitive notion that a party was morally bound by the statements of his witness. The application of this latter rule made it very hazardous to call an adverse party as a witness. However an adverse party is not always an adverse witness. An adverse witness means only one who gives evidence on a material matter[5] that is adverse, unfavorable or prejudicial to the party calling the witness. See Hernandez v. State, 156 Fla. *37 356, 22 So.2d 781 (Fla. 1945); Johnson v. State, 178 So.2d 724, 728 (Fla. 2d DCA 1965). Cf., Direct Transport Company of Florida v. Rakaskas, 167 So.2d 623 (Fla. 3d DCA 1964), cert. dismd., 176 So.2d 68 (Fla. 1965). A knowledgeable but unwilling, reluctant or recalcitrant witness should always be subject to interrogation by leading questions without regard to who called the witness or as to the witness' status as a party or identity with an adverse party or the possible interest the witness may have in the outcome of the case. Conversely, an obviously willing, forthright and candid witness need not, and should not, be led without regard to the witness' formal status or interest or whether the witness is being directly examined by the person calling the witness or cross-examined by anyone else. Thus, as Wigmore concludes, the test for permitting or prohibiting leading questions is ultimately and essentially independent of the superficial circumstance as to which party originally put the witness on the stand. 3A Wigmore, Evidence § 909 (Chadbourne Rev. 1970).
CONTRADICTION: In a similar practical vein, a party should be able to present all available evidence that tends to support the party's case without regard to the fact that it may tend to impeach because it may contradict previous testimony of a witness called by that party (Fla. Stat. § 90.608(1)(a), (1981)),[6] or because it proves that material facts are not as testified to by some previous witness called by the party.[7] Under prior law[8] a party calling a witness that proved adverse was required to satisfy the trial judge that the calling party had been surprised or entrapped by the testimony before the calling party could introduce a prior inconsistent statement of that witness. Although presenting a prior statement of the witness inconsistent with his present testimony is a general method of impeachment, see § 90.608(1)(a), Fla. Stat. (1981), its use as to a witness that was presumed to be helpful but who turned out to give prejudicial testimony is often not introduced so much for true impeachment as for the purpose of getting the prior statement before the jury for its consideration as substantive evidence.[9] In any event, the previous requirement of surprise in order to introduce prior inconsistent statements has now been eliminated by present section 90.608(2), Florida Statutes (1981).
IMPEACHMENT: The purpose of impeachment is to attack the credibility of a witness so that the trier of fact will accord his testimony less weight than otherwise. Accordingly, there is a good reason for a party to impeach a witness giving testimony harmful or adverse to that party but there is no proper purpose of impeachment in order to attack a witness that has not given testimony prejudicial to the person seeking to impeach the witness, and this is true without regard to who called the witness or the adverse witness' status. If a party believes a potential witness, whether a party or not, will not give testimony beneficial to that party or that the potential witness is not credible, the party should not call that witness. If a party believes the adverse party is credible and may give favorable testimony and, therefore, in good faith calls that party as a witness and the party-witness merely fails to give beneficial testimony but gives no prejudicial testimony,[10] *38 the calling party should not for that reason impeach the party-witness' character by evidence as to bad reputation for truthfulness (§ 90.609, Fla. Stat. (1981)) or prior conviction of crime, (§ 90.610, Fla. Stat. (1981).[11] Where an adverse party is in good faith called by a party to give favorable testimony and through no fault or design of the calling party the adverse party gives testimony prejudicial (unfavorable) to the calling party (either on direct examination by the opposing party, on cross-examination or in the adverse party-witness' case in chief), notwithstanding the restriction in section 90.608(1), Florida Statutes (1981), against a party impeaching his own witness, the calling party may not only contradict but may also impeach the adverse party-witness by attacking his character by evidence as to bad reputation for truthfulness (§ 90.609) and prior conviction of crime (§ 90.610).
In summary, section 90.608(1), Florida Statutes (1981), recognizes the general rule that a party cannot impeach his own witness. Section 90.608(2), Florida Statutes (1981), recognizes one limited exception permitting impeachment of any adverse witness (which includes an adverse party) by contradiction by other evidence or by a prior inconsistent statement. Florida Rule of Civil Procedure 1.450(a) permits a further exception where an adverse party or a witness closely identified with a corporate or partnership or association adverse party becomes an adverse witness, as defined above, in which case the adverse party-witness may not only be contradicted but may also be impeached as to a bad reputation for veracity (§ 90.609) and as to conviction of crime (§ 90.610). This is without regard as to whether such adverse testimony by the adverse party-witness is given upon direct or cross-examination or in the case in chief of the calling party or in the case in chief of the adverse party-witness.
Rule 1.450(a) merely reads that an adverse party when called as a witness may be led, contradicted and impeached "in all respects as if he had been called by" his own side. This refers to the procedural aspect and sequence of examination and was intended to authorize a party to call an adverse party and use the methods of cross-examination, i.e., leading questions and contradiction on direct examination. See Wigginton, New Florida Common Law Rules, 3 U.Fla.L.Rev. 1, 26 (1950).
However, Florida Rule of Civil Procedure 1.450(a) was not intended as a grant of the right to impeach, arbitrarily and wantonly, when not previously permitted under the law of evidence for the proper purpose of reducing the credibility of a witness giving prejudicial testimony. The reference to impeachment means that if the adverse-party-witness does elect to give prejudicial testimony at any stage of the trial, the calling party is not barred from impeaching the party-witness by the mere fact that the party-witness has been called under this rule. This rule should not be read to encourage or permit a party who believes that an adverse party, who has not elected to testify, is not credible and if called as an adverse witness will not give testimony favorable to the calling party, to, nevertheless, call the adverse party as a witness for the ulterior and improper purpose of wrongfully attacking that adverse party's present moral character or propensity in the guise of impeaching him as to a bad reputation for veracity and as to his prior conviction of crime. Rule 1.450(a) does not alone make the present bad moral *39 character or propensity[12] of every adverse party an issue in every case without regard to the cause of action or whether the adverse party has testified at all or whose testimony is not prejudicial to the party who desires to impeach him. Rule 1.450(a) is not a license for counsel for one party to predatorily call an adverse party as a witness and then, in the absence of prejudicial testimony, to harrass and abuse and "impeach" the adverse party by attacking his moral character by evidence of a bad reputation for truthfulness and conviction of crime. A party ought not have the coercive power over even an ordinary non-party witness he calls to attack and blacken, embarrass and defame the witness and destroy his credibility by impeachment if the witness fails to testify as wanted. This should also apply to a party-witness who by improper impeachment, in addition to damage to character, stands to risk the consequence of an unfair trial and of a judgment and an award of damages based on prejudice against the person of the party rather than on the relevant facts and law.
Notwithstanding that present section 90.608(2) eliminates the necessity of surprise in order to use prior inconsistent statements to impeach an adverse witness, we believe the following statement from Foremost Dairies, Inc., of the South v. Cutler, 212 So.2d 37 (Fla. 4th DCA 1968), is still applicable and especially so in this case:
A party will not be permitted to put a witness on the stand knowing that his testimony will be adverse and then claim surprise in order to impeach such witness. This is particularly true when the procedure is nothing more than a device or artifice to get into evidence before the jury that which would otherwise be inadmissible. Id. at 40.
It is clear from the record that the defendant did not elect to testify and the plaintiff did not call the defendant because she thought he was credible and would present favorable testimony either as to her case in chief or in rebuttal to the testimony presented by the defendant's sole witness, Deputy Caraway. The plaintiff had, before calling the defendant on rebuttal, already impeached his credibility by showing a bad reputation for truthfulness in her case in chief. A careful reading of the entire trial transcript of plaintiff's interrogation of defendant as a rebuttal witness convinces us that the primary objective and thrust of that examination was to attempt to show that the defendant's testimony at trial was inconsistent with his testimony in some deposition or some prior trial and to do this only in order to meet the trial judge's condition precedent to being able to further impeach the defendant as to his five or six prior convictions of crime. Perhaps because of his bad reputation and criminal convictions the defendant is a "bad guy" but there is no "bad guy" exception to rules of evidence and procedure designed to insure a fair trial and everyone is entitled to be treated fairly under law in a court of law.
Count II of the information doe snot allege a false imprisonment based on a wrongful confinement of plaintiff by the direct personal act of the defendant but only that the defendant wrongfully instigated and procured her arrest and imprisonment. Count I alleges malicious prosecution allegedly resulting from the same arrest. By its special verdict the jury awarded separate compensatory and punitive damages for both causes of action. Defendant's claim on appeal of error in the denial of his motions for a directed verdict as to both counts raises the question of whether the defendant can be liable for both malicious *40 prosecution and false imprisonment under the facts alleged and presented in this case. Although alike in some respects actions for false imprisonment and actions for malicious prosecution are distinct and the difference between them appears to relate to the regularity of the legal process under which the plaintiff's interests have been invaded. W. Prosser, Law of Torts 835 (4th ed. 1971). One who maliciously[13] institutes a criminal prosecution is deemed to intend to cause an arrest, which is a normal incident of a criminal prosecution, and the actor is liable for the confinement caused by the arrest only because it is a part of the damages caused by the malicious prosecution. Therefore, unless the defendant takes an active part in the service of a warrant issued as a result of the maliciously instituted criminal prosecution, his liability for the arrest is enforced only by way of greater damages for the malicious prosecution caused by the arrest and confinement. The liability for the arrest and confinement caused by the malicious institution of criminal proceedings is part of the damages resulting from malicious prosecution because in such a case, while the prosecution may have been commenced and carried out maliciously, the imprisonment is under process regular and in legal form issued by lawful authority and the resulting imprisonment is not false. To the contrary, a false imprisonment is a trespass committed by an unlawful arrest and confinement without legal authority. Notwithstanding that the two causes of action are distinct, because damages for resulting confinement are recoverable in a malicious prosecution action in which the existence of legal authority is implied, while the finding of a false imprisonment based on an arrest implies a lack of legal authority or lawful process, the recovery on one cause of action is generally held to bar recovery on the other when both relate to the same factual event. See 52 Am.Jur.2d Malicious Prosecution, § 3 (1970); Restatement (Second) of Torts § 35 (1977), comment on subsection (1); § 37, comment b; and § 654, comment e.
Section 901.15, Florida Statutes (1979), authorizes a peace officer to arrest without a warrant when he has probable cause to believe that a felony has been committed and that the person arrested has committed it. Such an arrest is lawful even though the officer in good faith relies on false information maliciously supplied by another. If the arrested person is legally harmed by a confinement resulting from such arrest he should have a remedy. If the officer is innocent and blameless the confined person should have a remedy in the form of a cause of action against the person maliciously causing his confinement but the confined person neither needs, nor is entitled to, two causes of action for that one wrongful act. The Restatement (Second) of Torts (1977), § 654(2)(c) takes the position that such an arrest is lawful and that there is no cause of action for false imprisonment[14] but that the lawful arrest on the criminal charge is the institution of criminal proceedings and is the basis for an action for malicious prosecution. This may or may not be consistent with the practice in Florida. Here it is generally considered that, except with reference to certain misdemeanors and violations of city and county ordinances, criminal prosecutions are commenced with the filing of an information or indictment based upon a charge decision made by a state attorney or grand jury,[15] or at least an arrest pursuant to a summons or arrest warrant issued by a committing magistrate.[16] In S.H. Kress & Co. v. Powell, 132 Fla. 471, 180 So. 757 (1938), Powell sued Kress for false imprisonment and malicious *41 prosecution. In holding that the plaintiff failed to state a cause of action for malicious prosecution the Florida Supreme Court said:
The summoning of a policeman and delivering the plaintiff to his custody and informing the policeman that the plaintiff had attempted to pass a counterfeit five dollar bill was not the commencement of a judicial proceeding, and did not involve the issuance of legal process, so as to constitute malicious prosecution.
180 So. at 761-762.
Because Powell's freedom of action was certainly significantly curtailed she should, at least today, be considered to have been arrested. Kress does not state that Powell was not arrested and if Kress is considered to have involved an arrest then Kress stands for the proposition, contrary to the Restatement, that an arrest does not initiate a criminal prosecution. However this may not be a substantive matter because, if an arrest does not initiate a criminal prosecution in Florida, a person injured by a confinement following an arrest without a warrant made by an officer whose probable cause was based on false information maliciously supplied by a wrongdoer should be considered wrongful (whether or not the arrest is considered valid) and the confined person should have a cause of action for the wrongful confinement against the wrongdoer who indirectly caused it. The difference would relate only to the theory under which the cause of action is brought and alleged. Under either theory the plaintiff would have one but not two causes of action. A party may set up alternatively, in the same action, two or more causes of action (Fla.R.Civ.P. 1.110(b)) but the pleader must, at some appropriate time before the jury is instructed, make an election where, as here, he is not entitled to recover damages on both causes of action.[17]
Accordingly, the judgment below is reversed and the cause is remanded for a new and fair trial consistent with this opinion.
REVERSED AND REMANDED.
SHARP, J., concurs specially with opinion.
FRANK D. UPCHURCH, Jr., J., dissents with opinion.
SHARP, Judge, concurring specially.
I agree with Judge Cowart's opinion that under the facts proven in this case, Carroll should not recover for both false imprisonment and malicious prosecution; and that they are mutually exclusive, or alternative causes of action. Further, I agree that the trial court committed reversible error in permitting Erp to be called as a rebuttal witness when Erp's testimony rebutted nothing in his case in chief, and in fact, corroborated it. 32 Fla.Jur. Trial § 45 (1960).
This was clearly harmful error in Erp's case. It allowed the plaintiff to justify the clearly erroneous bad character testimony, offered as part of her main case rather than on rebuttal, prior to Erp's ever testifying. And it allowed her to impeach Erp by making him admit he had previously been convicted of crimes. I am in sympathy with Judge Upchurch's opinion that Erp apparently behaved in an outrageous manner to the plaintiff in this controversy, but that does not justify courts abandoning well-established rules of evidence.
However, I am unwilling to agree with Judge Cowart that under Florida Rule of Civil Procedure 1.450(a) there are limitations to the right of a party to impeach an adverse party by any means, once he is properly called to testify. See Fed.R.Evid. 607, 611[1]. The rule itself contains no such *42 limitations. Indeed, a recent authority states:
The Adverse-Party Witness called by you must not be confused with the merely Adverse (Hostile or Unwilling) Witness discussed in the preceding Section of this Chapter. The right to impeach the Adverse-Party Witness derives from Fla.R. Civ.P. 1.450(a) and not from Florida Evidence Code 90.608. As a result, such impeachment is not limited to the two methods approved by 90.608 (contradictory evidence, and proof of prior inconsistent statements); nor by the foundational requirements imposed by that statute. (Emphasis original).
2 K. Hughes, Florida Evidence Manual § 194 (1975); see also 2 S. Gard, Florida Evidence § 20:01 (1980). Foremost Dairies, Inc., of the South v. Cutler, 212 So.2d 37 (Fla. 4th DCA 1968), cited by the majority opinion, dealt with a non-party witness. In any event, however, it is not necessary to address this issue in this case because the other errors mandate a reversal.
FRANK D. UPCHURCH, Jr., Judge, dissenting:
I respectfully dissent. While perhaps the majority is technically correct, I conclude that any error was only that, a technical one, which was harmless and would not have materially affected the ultimate outcome of the trial. Mr. Erp's conduct was despicable, especially against Mrs. Carroll, whose only offense was to request payment of a legitimate debt owed by Mr. Erp to her husband.
There was testimony that at the time the Carrolls were stopped by the police, Mr. Erp came screeching up in his Corvette on the wrong side of a four-lane street immediately in front of the Carrolls' vehicles (Mrs. Carroll's truck was stopped behind her husband's truck). When the Carrolls were told to pull their vehicles into a nearby parking lot, Mr. Erp followed, began jumping up and down, pointed at Mrs. Carroll and told the officer, "you get her too. She was in on it, too, she's part of it." He then pulled out a wad of money from his wallet and shaking it at Mrs. Carroll, yelled, "See. I got your goddamn money. I got your goddamn money" and "I'll fix you lady. I'll fix you." He stood by and watched as the Carrolls were arrested and taken to jail.
This type of behavior carries a high price. I doubt that any jury would place a lower value upon it, even if the trial were completely free of error. I would unhesitatingly affirm.
NOTES
[1] The facts are not necessary to understand the points of law on appeal but may help. Defendant, owner of a retail clothing store, owed plaintiff's husband for rental of a sign. Plaintiff went to defendant's store to collect the debt at a time when defendant was not at the store which was attended by defendant's employee Greg Ramputi. Plaintiff's husband came to the store, took merchandise to the counter, had a sales slip written, told Ramputi to charge the merchandise against what was owed for sign rental, and over Ramputi's objection, forcefully took the merchandise out of the store without paying for it. Ramputi called defendant or the police or both and later the defendant was present and communicated with an Ocala city policeman when plaintiff and her husband were stopped on a BOLO. When Marion County Deputy Sheriff Caraway later arrived at the scene the Ocala policeman left without communicating with Deputy Caraway. Deputy Caraway, who had earlier talked with Ramputi at the store, testified he made the decision to arrest plaintiff and her husband solely on the information he had obtained from Ramputi and from plaintiff and her husband and that he, Deputy Caraway, never met nor communicated with appellant.
[2] On the date in question, when the defendant first contacted the plaintiff at the point the plaintiff was later arrested, a City of Ocala policeman first arrived on the scene in a black and white police car. Then and there occurred the conduct referred to in the dissent to this opinion. The defendant had some conversation and contact with the city policeman. That policeman drove off when Deputy Caraway arrived without communicating any information to the deputy. Therefore the behavior that offends the dissent was not known to, or considered by, Deputy Caraway who alone made the decision to arrest the plaintiff. The defendant had, in his prior deposition, referred to the Ocala policeman as being a deputy. At trial the defendant's explanation that the person he referred to as a deputy during his deposition was not Deputy Caraway but the Ocala city policeman was largely the "inconsistency" in the testimony that was used as the basis for allowing the defendant to be impeached.
[3] See Cox v. State, 58 Fla. 33, 50 So. 875 (1909); Bryant v. United States, 120 F.2d 483 (5th Cir.1941).
[4] Section 90.608(1), Fla. Stat. (1981) which prohibits the party calling the witness from impeaching him is arguably inconsistent with Rule 1.450(a) which permits a party to call an adverse party as a witness and impeach him.
[5] Plaintiff's counsel also strenuously sought to question defendant on many immaterial matters (such as whether defendant ever telephoned plaintiff's home) claiming that if defendant testified untruthfully about those matters he would be, or could be, impeached. Evidence as to immaterial matters is inadmissible for any purpose and especially not for the purpose here asserted. Notwithstanding that the witness is an adverse party the questioner is bound by answers given to questions about matters collateral or immaterial to the factual issues in the case. See Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981). Although some counsel favor the practice a witness cannot properly be questioned about collateral or immaterial matters for the purpose of "testing his credibility" or impeaching the witness by contradition or otherwise as to his answers.
[6] See 3A Wigmore, Evidence § 902 (Chadbourne Rev. 1970).
[7] § 90.608(1)(e), Fla. Stat. (1981). In fairness one ought not be bound by his voucher of a witness' credibility when he discovers the witness' untrustworthiness after putting him on the stand. Further, the ends of truth are not served by binding a party to an error in calling a witness and it is the business of a court of justice, in self-respect, to permit the seeking of all sources of correct information, whatever the tactical mistakes of the adversaries. See also 3A Wigmore, Evidence § 907 (Chadbourne Rev. 1970).
[8] § 90.09, Fla. Stat. (1974) (amended 1978).
[9] This was formerly considered improper because the prior statement was considered hearsay but some prior statements are now not within the statutory definition of hearsay. See § 90.801(2)(a), Fla. Stat. (1981).
[10] See, e.g., Gibbs v. State, 193 So.2d 460 (Fla. 2d DCA 1967).
[11] In that circumstance the calling party is not bound by that party-witness' testimony and may introduce statements of the witness as described in section 90.801(2) or admissions under section 90.803(18), and such statements and admissions are incidentally considered as impeachment under section 90.608(1)(a), and may also introduce proof by other witnesses as to facts material to the issues in the cause although such material facts are not as testified to by the party-witness and are incidentally considered impeachment under section 90.608(1)(e), Florida Statutes (1981).
[12] A person's bad character is always relevant to indicate his probable doing of a bad act but an auxiliary legal policy of avoiding undue prejudice excludes it from evidence except in rebuttal; while this policy does not apply to impeachment of one who is only a witness and hence has nothing to lose from a prejudicial trial, it does apply to a party-witness, such as appellant Erp, who is accused of bad acts in a civil action, the same as to a defendant accused of crime. 3A Wigmore, Evidence § 877 (Chadbourn Rev. 1970); § 90.404(1)(a), Fla. Stat., (1981); Hodges v. State, 403 So.2d 1375 (Fla. 5th DCA 1981), cert. den. 413 So.2d 877 (Fla. 1982).
[13] Malicious here means without reasonable cause and for a purpose other than that for which the criminal prosecution is provided and, therefore, out of ill will, animosity and with a desire to do harm for harm's sake.
[14] See also Restatement (Second) of Torts (1977) § 35 comment as to subsection (1).
[15] See Florida Rules of Criminal Procedure 3.140(a) and (c)(2).
[16] See Florida Rule of Criminal Procedure 3.120.
[17] Under certain circumstances a person may be able to recover for both false imprisonment and malicious prosecution on closely related facts. If an arrest is not considered to initiate a criminal prosecution one can be liable to another for damages for maliciously causing a confinement to result from an arrest. Then the wrongdoer could thereafter also maliciously cause the formal initiation of criminal charges causing legal damages in addition to those resulting from the first wrong.
[1] Previously the right to call an adverse party and cross examine him was provided for in Federal Rule of Civil Procedure 43(b), which contained identical language as the current Florida Rule of Civil Procedure 1.450(a). The federal rule has been abrogated because its provisions are covered in the current Federal Rules of Evidence 607 and 611. Neither 607 nor 611 limits the right to impeach in any way an adverse party called as a witness in the opponent's case. 10 J. Moore, Moore's Federal Practice § 607.02 (2d ed. 1982).